UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RANDY BELLMAN,

Plaintiff,

v.

SUZANNE GROFF et al.,

Defendants.

Case No. 1:25-cv-415

Hon. Hala Y. Jarbou

# OPINION

This is a civil rights action brought by Plaintiff Randy Bellman under 42 U.S.C. § 1983. The Court has granted Plaintiff leave to proceed *in forma pauperis*. This matter is now before the Court on Defendant Suzanne Groff's motion to dismiss for failure to state a claim (ECF No. 17) and motion for summary judgment (ECF No. 29) and on Defendant Nathan Mikel's and Defendant Rosemary Villasan's motion for summary judgment (ECF No. 31). For the reasons set forth below, the Court will grant both motions for summary judgment.

## Discussion

### I. Factual Allegations

Plaintiff is serving a life sentence in the custody of the Michigan Department of Corrections (MDOC) following a 2003 Macomb County Circuit Court jury conviction on a charge of first-degree murder. *See* MDOC Offender Tracking Information System (OTIS), https://mdocweb.state.mi.us/otis2/search (enter First Name "Randy," Last Name "Bellman," select

Search, select Offender Number 314047) (last visited Sept. 9, 2026).[1] Plaintiff is presently housed at the Lakeland Correctional Facility (LCF) in Coldwater, Michigan. Plaintiff sues the following LCF personnel: Medical Provider Suzanne Groff; Health Unit Manager Nathan Mikel; and Registered Nurse Rosemary Villasan. Plaintiff contends that each defendant was deliberately indifferent to Plaintiff's serious medical need—neck pain—in violation of Plaintiff's Eighth Amendment rights.

This is not Plaintiff's first lawsuit regarding his medical care at LCF. In *Bellman v. Mikel*, No. 1:23-cv-1119 (W.D. Mich.) (*Bellman I*),[2] Plaintiff alleged that he arrived at LCF on October 8, 2020. Within a few short weeks of Plaintiff's arrival, he began to suffer severe pain in the back of his neck. Op., *Bellman I* (ECF No. 5, PageID.33–35.) Plaintiff had an x-ray, then a CAT scan, and then an MRI. *Id*. On May 5, 2021, Plaintiff underwent surgery. *Id*. Plaintiff sued several healthcare providers from LCF seeking compensation for the pain he suffered while he waited for surgery and then continued to suffer after the surgery. *Id*. By opinion and judgment entered December 5, 2023, the Court dismissed *Bellman I* for failure to state a claim on which relief might be granted. Op. & J., *Bellman I* (ECF Nos. 5, 6.)

Plaintiff filed the present action on April 14, 2025. Plaintiff filed an amended complaint on May 12, 2025. The focus of Plaintiff's first amended complaint is a two or three-week window of time during August of 2024. Plaintiff reports that he sought medical treatment for severe neck pain as manifested by a lump in his neck area. (Am. Compl., ECF No. 6, PageID.37.) Plaintiff alleges

[1] This Court takes judicial notice of the information provided by a search of the MDOC's OTIS website with regard to Plaintiff. *See, e.g., United States v. Alexander*, 543 F.3d 819, 824 (6th Cir. 2008); *Carpenter v. Mich. Dep't of Corr. Time Computation Unit*, No. 1:13-cv-313, 2013 WL 1947249, at *1 n.1 (W.D. Mich. May 9, 2013); *Ward v. Wolfenbarger*, 323 F. Supp. 2d 818, 821–22 n.3 (E.D. Mich. 2004).

[2] Plaintiff specifically references *Bellman I* in his amended complaint. (ECF No. 6, PageID.36.)

that he "was seen by" Defendant Villasan on August 16, 2024. (*Id.*) Plaintiff claims that Villasan told him he would be seen by Defendant Mikel. Nonetheless, Plaintiff "was not seen." (*Id.*)

Plaintiff states that Defendant Villasan sent him back to his housing unit telling him he would be seen by Defendant Groff. (*Id.*) Plaintiff was not seen by Defendant Groff on August 16. (*Id.*)

Plaintiff states that he "learned" that Defendant Mikel declined to see Plaintiff or provide treatment because, according to Plaintiff, Defendant Mikel believed that Plaintiff was faking his pain. (*Id.*) Plaintiff states that Defendant Groff declined to see Plaintiff because she believed he was faking his pain. (*Id.*) Plaintiff states that Defendant Villasan also denied Plaintiff treatment on August 16 because she believed Plaintiff was faking his pain. (*Id.*)

On August 24, 2024, a nurse visited Plaintiff in his cell. (*Id.*) Plaintiff states that the nurse "provided him with a treatment plan for an ailment he was not claiming caused him severe pain in the neck area." (*Id.*)

On August 26, 2024, Plaintiff filed a grievance regarding his neck pain. (Grievance, ECF No. 29-5, PageID.293–296.)[3] Plaintiff's grievance makes clear that the encounter described on August 16 regarding Plaintiff's neck pain was one of many that occurred in the weeks and months that preceded August 16. Plaintiff described his problem as follows:

> DELIBERATE INDIFFERENCE TO MY MEDICAL NEEDS BY DELAYING OR DENYING MEDICAL TREATMENT
>
> I have a lump on my neck and I was informed that it was not normal. After complaining over several months, I forwarded a medical kite to health care to obtain some form of medical treatment for the severe pain in my neck. On 8-16-24, I was told I would be seen by the HUM. This did not occur. I was again told that I would be seen by the medical provider. This did not occur. I was informed by Nurse

[3] Although the grievance documents cited were provided by Defendant Groff with her motion for summary judgment, Plaintiff filed the same documents as attachments to his initial complaint. (ECF No. 1-1, PageID.11–16.)

> Villasan that all my medical kites were forwarded [to] the HUM. To date, 8-26-24, I have yet to be seen [b]y the HUM, or the Medical Provider, and I am being told by Nurse Villasan that I will be seen by them. This has been over (10) days and I have yet to see anyone in health care to provide any type of medical treatment, or to evaluate the lump and provide a diagnosis as to what the lump is, and why does it cause severe pain. The delay by these medical employees are the deliberate indifference the Courts have ruled an Eighth Amendment violation. Tho pain in my neck is severe enough to have been given a EMG, and referrals for a Neurosurgeon. On 8-22-24, nothing have been done to verify my medical problem, or diagnose what is causing the severe pain. The conduct of the employees named in this grievance is contrary to MDOC policy and my constitutional rights to receive medical treatment while l am confined under the care and supervision of the MDOC.
>
> RESOLUTION: I request that the HUM, the Medical Provider, or Nurse Villasan, be ordered to provide a medical diagnosis, or have a Specialist properly examine me and provide a diagnosis regarding the lump in my neck, and the plan of care needed to treat the matter to rid me of the severe pain and suffering. An[y] mode of retaliation for this grievance is against policy, PD-03.0l.130 and will be litigated therefrom under Title 42 USC § 1983. My 8th. Amendment right to be free of cruel and unusual punishment is being violated by forcing me to live in a continued state of severe pain without any medical treatment, or diagnosis to provide a plan of care to medically treat the ailment to combat the severe pain, by the employees mentioned above.

(*Id.*, PageID.293.) On the grievance form, Plaintiff described his efforts to resolve the issue raised as follows:

> The medical issue could not be resolved because Health Care Department did not respond to my medical kite following the 8-16-24 initial kite. This grievance is against the HUM Mikel, PA Groff; Nurse Villasan for the failure to provide medical treatment to my acute pain and suffering from the lump on my neck. This grievance is timely to exhaust administrative remedies.

(*Id.*) The Step I response, issued on August 28, 2024, notes that

> [u]pon investigation and review of the Electronic Medical Record (EMR), inmate KITE was received on 8-15. Said KITE was requesting the name of injection that he had received and what the side effects were. This Kite was answered by HUM with attachment of name of medica[ti]on and side effects. Inmate was evaluated in cell on 8-24-24 and given a treatment plan and nurse visit. Prisoner has since been examined by nursing staff and had provider appoint[t]ment scheduled.

(*Id.*, PageID.296.)

Plaintiff filed a Step II appeal. (*Id*., PageID.294.) He noted that, during the cell visit on August 24, 2024, the nurse did not "evaluate or diagnose the lump on [Plaintiff's] neck or attempt to explain what the lump was, and why it was causing [Plaintiff] so much pain." (*Id*.) The appeal was rejected as untimely, (*id*.), and the rejection was upheld at Step III, (*id*., PageID.293.)

On October 25, 2024, Plaintiff was sent to Henry Ford Health Center where his "images" were reviewed by Dr. Ullah. (Am. Compl., ECF No. 6, PageID.32, 38.) Plaintiff alleges that Dr. Ullah informed Plaintiff that he would need surgery to remove the lump. (*Id*.) After Plaintiff was so informed, he did not receive any medical treatment from Defendants Groff, Mikel, or Villasan. (*Id*.)

When Plaintiff realized "he was not going to receive any type of medical treatment from his medi[c]al provider, Defendant Groff, for his severe neck pain, he initiated communication with the Michigan Legislative Ombudsman Office for assistance." (*Id*., PageID.38.) Plaintiff attached two letters from the Legislative Corrections Ombudsman, Keith Barber, to his initial complaint. (May 8, 2024, Corr., ECF No. 1-1, PageID.17; July 2, 2024, Corr., ECF No. 1-1, PageID.18.)[4]

The crux of Plaintiff's complaint is that Defendants failed to provide treatment for Plaintiff's neck pain. Plaintiff offers a couple of examples of the treatment he wanted to receive: surgery and pain medication. He claims he received no treatment at all.

Defendants have provided portions of Plaintiff's medical record and affidavits detailing their involvement in Plaintiff's care. (*See generally* MDOC Medical Records, ECF Nos 29-1, 29-2, 32-5; Groff Aff., ECF No. 29-3; Mikel Aff., ECF No. 32-3; Villasan Aff., ECF No. 32-4.) Those records show that Plaintiff participated in many encounters at LCF and offsite that were focused

[4] The exhibits attached to Plaintiff's initial complaint are deemed to be part of his amended complaint per the Court's April 21, 2025, order directing Plaintiff to file an amended complaint. (Order, ECF No. 4, PageID.25.)

on diagnosis and treatment of Plaintiff's neck pain. Those records also show that Plaintiff's neck pain was just one of several chronic conditions that required medical treatment. Although there are some inconsistencies between Defendants' descriptions of their contact and communications with Plaintiff and Plaintiff's descriptions, at Plaintiff's deposition, he did not dispute that the events documented in the medical record occurred, even when he did not specifically recall them. (ECF No. 29-2, PageID.290–291.) Thus, this is not a circumstance where Plaintiff claims that the medical record is false. Yet Plaintiff's main contention that he received no treatment simply cannot be reconciled with the detailed medical record.

Plaintiff's recounting of these events does not appear to be entirely accurate. By way of example, Plaintiff's statement that, upon realizing that Defendants were not going to treat his neck pain following the MRI, he initiated communications with the Ombudsman is belied by the letters Plaintiff references in his complaint.[5] The communications with the Ombudsman occurred months before the MRI.

Plaintiff contends also that Defendants did not follow their own policies in providing—or, more accurately, failing to provide—treatment for Plaintiff's neck pain. (Compl., ECF No. 6, PageID.38.) Those protocols are set forth in the MDOC Policy Directive (PD) regarding Health Services, 03.04.100. The version in effect at the time of the events set forth in Plaintiff's complaint became effective on January 9, 2023.[6] The policy directive describes three types of conditions that require care:

---

[5] "When a document attached to the complaint contradicts the allegations, the document trumps the allegations ... [if the] document ... 'utterly discredit[s]' the allegations." *In re Flint Water Cases*, 960 F.3d 303, 329 (6th Cir. 2020).

[6] The Court takes judicial notice of the content of the MDOC policy directive in effect at the time of the events alleged in Plaintiff's complaint. The MDOC's policy directives are a proper subject of judicial notice under Federal Rule of Evidence 201(b). *See Toth v. Grand Trunk R.R.*, 306 F.3d 335, 349 (6th Cir. 2002) ("Administrative regulations fall within the category of facts 'capable of

1. Emergent: A condition that a delay in treatment may result in death or permanent impairment.

2. Urgent: A condition that is not likely to cause death or irreparable harm if not treated immediately. However, the condition needs to be treated as soon as possible.

3. Routine: A condition that requires non-urgent, non-emergent health care contact with a prisoner, including screening, chronic disease follow-up, and requests for elective treatment and surgeries.

PD 03.04.100, ¶ A. The directive also describes different types of providers. For example, there are qualified health professionals (QHPs): "A Physician, Psychiatrist, Nurse Practitioner, Physician Assistant, Psychologist, Social Worker, Licensed Professional Counselor, Dentist, Registered Dental Hygienist, or Registered Nurse who is licensed and registered/certified by the State of Michigan to practice within the scope of their training." *Id.*, ¶ E. And there are medical providers (MPs): "A qualified health professional who is a Physician, Physician Assistant, or Nurse Practitioner licensed to practice in the State of Michigan." *Id.*, ¶ C. Based upon these classifications, Defendant Groff is an MP; Defendants Mikel and Villasan are QHPs. Moreover, Defendant Mikel, as the Health Unit Manager, is "responsible for the operation of the Health Care clinic, except for issues that require medical judgment." *Id.*, ¶ X.

Under the policy directive, the prisoner initiates a request for health services. For routine services:

TT. Prisoners shall submit a Health Care Request (CHJ-549) to request routine health care services, including reassessment of the need for an assistive device or other service provided to the prisoner to meet their medical needs. Housing unit staff shall assist illiterate prisoners and others who are unable to complete the form. A locked container shall be provided that is easily accessible to all general

---

accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.' "); *see also International Bhd. of Teamsters, Chauffeurs, Warehousemen and Helpers of America v. Zantop Air Transp. Corp.*, 394 F.2d 36, 40 (6th Cir. 1968) (noting that "a [c]ourt may take judicial notice of the rules, regulations and orders of administrative agencies issued pursuant to their delegated authority").

> population prisoners in which they can place the form for all health-related issues. These containers shall be opened only by Health Care staff. Health Care staff shall collect the forms at least daily. Every form received shall be date stamped by appropriate Health Care staff along with the initials of the person that triaged the form. The CHJ-549 shall be entered into the Prisoner Health Record noting the presenting complaint within one business day of receipt.
>
> UU. An appropriate QHP shall triage the information presented on the Health Care Request (CHJ-549) as soon as possible but no later than one business day after initial receipt by Health Care staff. Requests shall be addressed as follows:
>
> 1. For conditions that could be emergent, schedule the prisoner to be seen immediately by an appropriate QHP.
>
> 2. For conditions that could be urgent, schedule the prisoner to be seen by an appropriate QHP no later than the next business day.
>
> 3. In all other cases, provide the prisoner with a written response and an appointment, if appropriate, within five business days after receipt of the request. For medication issues, the matter may be referred to a Pharmacy Assistant or LPN to take appropriate action. For health record information, the matter may be referred to a Health Information Manager or designee.
>
> VV. In all cases, whenever a prisoner is referred to a Medical Provider for a routine matter, the Medical Provider shall see the prisoner within five business days of the referral.

*Id*. For urgent or emergent health services:

> XX. Any prisoner who believes they have an urgent/emergent health condition may request health care services by notifying staff of the problem that they believe requires an immediate health care visit. The staff person shall contact health care services and convey the prisoner's request, regardless of the prisoner's custody status or the time or day of the request. Staff shall similarly contact health care services whenever they believe that a prisoner may have an urgent/emergent health condition even if the prisoner has not requested a health care visit. Staff shall document all contacts with Health Care in the appropriate assignment logbook. The log entry shall include the name of the Health Care staff member that was contacted. The contact shall be responded to as soon as possible by one or more of the following methods, as determined by the QHP:
>
> 1. The prisoner shall be allowed to speak directly to the QHP by telephone.
>
> 2. The prisoner shall be allowed to go to the health services area.
>
> 3. The QHP shall go to the prisoner's location to conduct an assessment.
>
> 4. The prisoner shall be sent to the nearest medical emergency department.

*Id*. Defendant Groff expanded upon the policy directive description of the health care process in her affidavit:

> As a medical provider, I am not involved with reviewing or responding to kites filed by inmates. Kites are triaged and responded to by the nursing staff. If the inmate needs to be seen by medical, they will be scheduled for a nursing visit.
>
> a) This triage process is standard practice within the facility and is designed to ensure that inmates are first evaluated by nursing staff to determine the appropriate level of care, including whether referral to a medical provider is necessary.
>
> b) If the inmate needs to be seen by a medical provider, the nurse will schedule an appointment.
>
> c) If an issue raised in the kite needs to be reviewed by a medical provider, a chart review or provider appointment will be scheduled.

(Aff. of Def. Groff, ECF No. 29-3, PageID.282, ¶ 4.)

It is against that factual backdrop that the Court will consider Defendants' summary judgment motions.

## II. Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact is genuinely disputed when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249 (citing *First Nat'l Bank of Ariz. v. City Serv. Co.*, 391 U.S. 253, 288–89 (1961)). "Putting all of that together, Rule 56 asks 'whether [the evidence is so one-sided that one party must prevail as a matter of law.'" *DeVooght v. City of Warren, Mich.*, 157 F.4th 893, 899 (6th Cir. 2025) (quoting *Anderson*, 477 U.S. at 252).

Summary judgment is not an opportunity for the Court to resolve factual disputes. *Id*. The Court "must shy away from weighing the evidence and instead view all the facts in the light most favorable to the nonmoving party and draw all justifiable inferences in their favor." *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 410 (6th Cir. 2021). Nonetheless, a court need not accept bare legal conclusions couched as factual allegations or unwarranted factual inferences in resolving a motion for summary judgment. *See, e.g., Yanovich v. Zimmer Austin, Inc.*, 255 F. App'x 957, 969 (6th Cir. 2007) ("Even under the generous standard of review for a grant of summary judgment, we do not 'accept as true legal conclusions or unwarranted factual inferences.'").

An opponent of a motion for summary judgment "may not rest upon mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 248. The non-moving party "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Id*., at 257. Federal Rule of Civil Procedure 56(c) identifies the types of affirmative evidence contemplated: "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). Defendants have provided the medical record, affidavits, and excerpts of Plaintiff's deposition testimony in support of their motions. Plaintiff, however, has not provided affirmative evidence in response.

Plaintiff's initial complaint and his amended complaint include the following verification:

> I, Randy John Bellman, hereby verify under the penalty of perjury, that I have read the above complaint and jury demand. That the same is true in all respects as to the statement of facts. That as to Constitutional provisions, statutes, case law authority, and all other legal concepts, I believe them to be true and hereby place my reliance thereupon. FURTHER, I say not.

(Am. Compl., ECF No. 6, PageID.41.) That is similar to the verification that is required to support an unsworn statement: "I declare (or certify, verify, or state) under penalty of perjury that the

foregoing is true and correct. Executed on (date). (Signature)." 28 U.S.C. § 1746. But it is not identical. Significantly, the variation renders the statement ambiguous. The first sentence states, under penalty of perjury, that Plaintiff has read the complaint and jury demand. The second sentence might be read to mean that the complaint is true in all respects as to the statement of facts. It could alternatively be read to mean that Plaintiff has also read the statement of facts.

There is another layer of ambiguity in Plaintiff's verification. The complaint he offers under penalty of perjury specifically states that it is submitted "on information and belief." (Am. Compl., ECF No. 6, PageID.34.) Summary judgment cannot be granted on facts based upon a person's "belief." *See Ondo v. City of Cleveland*, 795 F.3d 597, 605 (6th Cir. 2015) ("statements made on belief or on information and belief, cannot be utilized on a summary-judgment motion") (internal quotation marks omitted).

The Court concludes that the ambiguities identified above disqualify the factual statements in the amended complaint from consideration when resolving Defendants' motions for summary judgment. The Court notes, however, that the Sixth Circuit Court of Appeals has recently encouraged courts to be flexible in interpreting the requirements of 28 U.S.C. § 1746. *See In re First Energy Corp*., 154 F.4th 431, 439 (6th Cir. 2025). For that reason, the Court will also consider Defendants' motions accepting Plaintiff's verification as valid under 28 U.S.C. § 1746.

Even when the Court considers Plaintiff's "verified" statements, the Court need not accept every "verified" statement as true. Federal Rule of Civil Procedure 56 identifies specific requirements for affidavits or declarations used to support or oppose a motion for summary judgment: they "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

With regard to the "personal knowledge" requirement, the Sixth Circuit has explained that "[p]ersonal knowledge 'is gained through firsthand observation or experience, as distinguished from a belief based on what someone else has said." *Nationwide Recovery, Inc. v. City of Detroit, Mich.*, 163 F.4th 977, 987 (6th Cir. 2026) (quoting *Personal Knowledge*, Black's Law Dictionary (12th ed. 2024)). Moreover, to the extent Plaintiff's "verified" statements reflect only that which he heard from others, it is not properly before the Court because it is inadmissible hearsay. *See, e.g., Blount v. Stanley Engineering Fastening*, 55 F.4th 504, 516 (6th Cir. 2022) (concluding that the district court properly excluded an affidavit containing "extensive hearsay"); *Jacklyn v. Schering Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 927 (6th Cir.1999) (holding that the court may not consider hearsay on a motion for summary judgment).

Several statements in Plaintiff's "verified" complaint do not satisfy the requirements of Rule 56(c)(4), including the following:

> On 10/25/24, Plaintiff was sent to Henry Ford Hea[l]th Center where his "Images" were reviewed by Doctor Waseem Ullah, M.D., and he was informed that he would need surgery to remove the lump.
>
> * * *
>
> 4. Plaintiff learned that on August 16, 2024, Defendant Mikel declined to see Plaintiff, or provide any type of medication treatment because he was under the acute belief that Plaintiff was faking his pain, and Defendant would not provide any medication for pain.
>
> 5. On the same date, Defendant Groff declined to see Plaintiff, or diagnose his medical needs because she believed Plaintiff was faking his acute pain illness and she refused to provide any type of pain medication and allowed Plaintiff to return to his housing unit without medical treatment.
>
> 6. On August 16, 2024, Plaintiff was denied any type of medical treatment by Nurse Villasan because she believe that Plaintiff was faking his claim of pain in his neck area and she refused to provide him with Tylenol and sent him back to his housing unit without any medical treatment.
>
> * * *

> 11. Plaintiff was sent to Henry Ford Health on October 25 , 2024, where his "Images" was reviewed by Doctor Waseem Ullah, M.D., who told Plaintiff that he would need surgery to remove the 'lump', but did not inform Plaintiff what the lump was, and sent him back to LCF Defendants for further medical treatment

(Am. Compl., ECF No. 6, PageID.32, 37.) Plaintiff has provided no basis for his personal knowledge about the Defendants' beliefs regarding Plaintiff's pain. Plaintiff's "information and belief" regarding Defendants' beliefs is contradicted by Defendants' affidavits. (Groff Aff., ECF No. 29-3; Villasan Aff., ECF No. 32-4, Mikel Aff., ECF No. 33-1.) And Plaintiff's recounting of Dr. Ullah's conclusion regarding surgery is hearsay.

It is also important to note that "[e]ven if Rule 56 commands judges to view the facts in the light most favorable to the nonmoving party, it certainly doesn't require [the court] to put blinders on." *DeVooght*, 157 F.4th at 900. It is clear that Plaintiff's version of his treatment and Defendants' versions conflict, but that does not end the inquiry.

> When . . . the parties tell conflicting stories, "one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). This applies not only when there is videotape evidence, but whenever the nonmoving party's version is "so blatantly contradicted by objective evidence in the record that it fails to create a genuine issue of material fact for trial." *Coble*, 634 F.3d at 869. Here, without making a credibility determination, the district court found that Webster's version of Bowling's actions was blatantly contradicted by the uncontroverted medical evidence showing that "the type of fracture [Webster] suffered resulted from an impact consistent with a fall, and not by being twisted." We agree. Because Webster's version rested on a showing that Bowling twisted Webster's hand with sufficient force to cause the fracture, a fact that was blatantly contradicted by the only medical evidence that had been presented. Webster's testimony in that regard was insufficient to create a genuine issue of material fact for trial. *See Griffin*, 604 F.3d at 956.

*Booher ex rel. T.W. v. Montavon*, 555 F. App'x 479, 484 (6th Cir. 2014) (parallel citation and footnote omitted). Many of Plaintiff's statements are "blatantly contradicted by the only medical evidence that has been presented." *Id*.

"[T]he standard that a movant must meet to obtain summary judgment depends on who will bear the burden of proof at trial." *Trs. of Iron Workers Defined Contribution Pension Fund v. Next Century Rebar, LLC*, 115 F.4th 480, 488 (6th Cir. 2024) (alteration in original) (quoting *Pineda v. Hamilton Cnty.*, 977 F.3d 483, 491 (6th Cir. 2020)). "[W]hen the moving party bears the burden of proof [at trial], their initial summary judgment burden is higher in that [they] must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Id*. at 489 (quoting *Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001) (internal quotation marks omitted). When the moving party does not bear the burden of proof at trial, they may meet their initial burden at summary judgment by "either: (1) submitting 'affirmative evidence that negates an essential element of the nonmoving party's claim'; or (2) demonstrating 'to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim.'" *Kava v. Peters*, 450 F. App'x 470, 473 (6th Cir. 2011) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 331 (1986) (Brennan, J., dissenting)). The nonmovant must then present "sufficient evidence from which a jury could reasonably find in [their] favor." *Davis v. Sig Sauer, Inc.*, 126 F.4th 1213, 1230 (6th Cir. 2025).

Plaintiff—the non-moving party—bears the burden of proof at trial. The moving parties, Defendants Groff, Villasan, and Mikel, must demonstrate that Plaintiff cannot present evidence to show an essential element of his claim or present evidence that negates an essential element of Plaintiff's claim. As set forth below, the Court finds that Defendants have done both.

## III. Plaintiff's § 1983 Claim for Deliberate Indifference to his Serious Medical Need

Section 1983 is a method for vindicating federal rights, not a source of substantive rights itself; thus, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994). Plaintiff contends that

Defendants were deliberately indifferent to his neck pain in violation of the Eighth Amendment and the Fourteenth Amendment.

**A. Fourteenth Amendment Due Process Clause**

The Eighth Amendment prohibits the infliction of cruel and unusual punishment against those convicted of crimes. U.S. Const. amend. VIII. The Eighth Amendment obligates prison authorities to provide medical care to incarcerated individuals, as a failure to provide such care would be inconsistent with contemporary standards of decency. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). But Plaintiff also contends that he is entitled to protection under the Due Process Clause of the Fourteenth Amendment. The Sixth Circuit Court of Appeals has recognized that, to the extent the right to medical care is a due process right, it is "a substantive due process right . . . ." *Colson v. City of Alcoa, Tenn.*, 37 F.4th 1182, 1187 (6th Cir. 2022).[7]

But convicted prisoners like Plaintiff do not need to rely on a substantive due process right with regard to medical care. They are entitled to medical care under the Eighth Amendment because a failure to provide such care would be inconsistent with contemporary standards of decency and, thus, would render their punishment cruel and unusual.

Critically, "[w]here a particular [a]mendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that [a]mendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.'" *Albright*, 510 U.S. at 269 (quoting *Graham v. Connor*, 490 U.S. 386, 394 (1989)) (holding that the Fourth Amendment, not substantive due process, provides the standard for

[7] The fact that the right to medical care is a substantive due process right, rather than a procedural due process right, reflects the fact that the state cannot avoid the obligation to provide medical care by affording a person the essential guarantees of procedural due process—notice of the intended deprivation and an opportunity to be heard. Thus, Plaintiff could not prevail on a procedural due process claim for failure to provide medical care.

analyzing claims involving unreasonable search or seizure of free citizens, and the Eighth Amendment provides the standard for such searches of prisoners); *see also United States v. Lanier*, 520 U.S. 259, 272 n.7 (6th Cir. 1997) ("*Graham* simply requires that if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process."); *Walker v. Norris*, 917 F.2d 1449, 1455 (6th Cir. 1990) (explaining that, "plaintiff's section 1983 claim in a [deliberate indifference] case such as this must be for redress of eighth amendment, not fourteenth amendment substantive due process, rights" (citations omitted)); *O'Brien v. Mich. Dep't of Corr*., 592 F. App'x 338, 344 (6th Cir. 2014 ) ("O'Brien's allegations concerned the denial of medical care, thus, '[t]he Eighth Amendment is the primary source of substantive protection' available to him . . . not the more generalized notion of 'substantive due process[.]'"). Because the Eighth Amendment provides an explicit textual source of protection against the alleged deliberate indifference to risks of harm, Plaintiff's due process claim—is properly dismissed.[8]

**B. Eighth Amendment Claim**

A viable Eighth Amendment claim consists of an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A court considering such a claim must ask both if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and

[8] Although the relevant protection afforded convicted prisoners arises from the Eighth Amendment, that amendment cannot protect every person held in custody, because the Eighth Amendment is a limit on "punishment." Not every person held in custody is subject to punishment. *DeShaney v. Winebago Cnty. Dept. of Soc. Servs*., 489 U.S. 189, 199 n.6 (1989) Indeed, until a person has been convicted, the person cannot be punished. *Id*. The right to medical care and reasonably safe conditions of confinement for such a person—a pretrial detainee, for example—must arise from a source other than the Eighth Amendment; the Supreme Court has settled on the Due Process Clause of the Fourteenth Amendment. *Ingraham v. Wright*, 430 U.S. 651, 671 n.40 (1977); *Bell v. Wolfish*, 441 U.S. 520, 535 (1979).

if the officials acted with a sufficiently culpable state of mind. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992).

**1. Objective Component**

"Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id*. at 9. In other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm. *Farmer*, 511 U.S. at 834. The objective component of the adequate medical care test is satisfied "[w]here the seriousness of a prisoner's need[] for medical care is obvious even to a lay person." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 899 (6th Cir. 2004); *see also Phillips v. Roane Cnty.*, 534 F.3d 531, 539–40 (6th Cir. 2008).

The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). In *Phillips v. Tangilag*, 14 F.4th 524 (6th Cir. 2021), the Sixth Circuit explained:

> More frequently, doctors provide some care and prisoners challenge their treatment choices as inadequate. To establish the objective element in this common situation, prisoners must show more. *See Anthony v. Swanson*, 701 F. App'x 460, 463–64 (6th Cir. 2017); *Santiago v. Ringle*, 734 F.3d 585, 590 (6th Cir. 2013). Objectively speaking, this care qualifies as "cruel and unusual" only if it is "so grossly incompetent" or so grossly "inadequate" as to "shock the conscience" or "be intolerable to fundamental fairness." *Rhinehart*, 894 F.3d at 737 (quoting *Miller v. Calhoun County*, 408 F.3d 803, 819 (6th Cir. 2005)). Ordinary individuals outside a prison's walls and inmates within those walls both face a risk that their doctors will perform incompetently. That is why the states have adopted a well-established body of tort law to remedy the harms caused by medical malpractice. But mere malpractice does not violate the Eighth Amendment. *See Estelle*, 429 U.S. at 106,. Only grossly or woefully inadequate care—not just care that falls below a professional standard—can be called "cruel and unusual." *See Rhinehart*, 894 F.3d at 737; *Jones v. Muskegon County*, 625 F.3d 935, 945–46 (6th Cir. 2010); *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976); *Hixson v. Moran*, 1 F.4th 297, 303 (4th Cir. 2021); *Hoffer v. Sec'y, Fla. Dep't of Corrs*., 973 F.3d 1263, 1271 (11th Cir. 2020). This test avoids turning the Eighth Amendment into a federal malpractice statute. *Cf. Burgess*, 735 F.3d at 476.

> For prisoners to prove grossly inadequate care, moreover, courts generally require them to introduce medical evidence, typically in the form of expert testimony. *See Rhinehart*, 894 F.3d at 737, 740–43; *Napier v. Madison County*, 238 F.3d 739, 742 (6th Cir. 2001). This medical-evidence requirement makes sense in a world in which the Supreme Court looks to the "evolving standards of decency" to determine the Eighth Amendment's standards. *Estelle*, 429 U.S. at 106. Even for garden-variety negligence claims, "[t]he overwhelming weight of authority supports the view that ordinarily expert evidence is essential to support an action for malpractice against a physician or surgeon." H.H. Henry, Annotation, *Necessity of Expert Evidence to Support an Action for Malpractice Against a Physician or Surgeon*, 81 A.L.R. 2d 597, § 2 (1962 & Supp. 2021) (collecting cases). So a medical-evidence requirement sits comfortably within society's "decency" standards. And it would be odd if a prisoner could prove an Eighth Amendment claim more easily than an ordinary individual could prove a malpractice claim.

*Phillips*, at 534–35.

Plaintiff describes the nature of his claim in two different ways: he states that Defendants refused to provide medical treatment and he also states that the Defendants delayed providing medical treatment. (Am. Compl., ECF No. 6, PageID.34–35 (Introduction), 36 (¶ 1), 39 (¶ 20).) Under either description, in response to Defendants' motions, Plaintiff has failed to show any genuine issue of material fact regarding the objective component of his Eighth Amendment claim.

**a. Complete Denial of Medical Care**

Plaintiff's contention that Defendants completely denied him medical care is blatantly contradicted by Defendants' affidavits, the medical record, the documents submitted by Plaintiff, and Plaintiff's allegations in *Bellman I*. As a starting point, Plaintiff's neck pain did not show up out of the blue on August 15, 2024. He complained about the treatment he was provided for neck pain beginning shortly after his arrival at LCF in the fall of 2020.

Within two months of first experiencing neck pain, Plaintiff had his first spinal fusion surgery. (Mar. 17, 2025, Henry Ford Neurosurgery Notes, ECF No. 29-2, PageID.219–228.) Plaintiff underwent revision surgery in May of 2021. (*Id.*) According to his *Bellman I* complaint and attachments, he continued to suffer neck pain at least through early 2023.

Plaintiff had an EMG diagnostic test during February of 2024. (*Id.*) Plaintiff was seen in the Hillsdale Hospital Pain Clinic on June 12, 2024. (June 12, 2024, Pain Clinic notes, ECF No. 29-1, PageID.154–158.) The Clinic recommended an epidural steroid injection as well as home exercise, ice therapy, and anti-inflammatory medications. (*Id.*) At that time, Plaintiff was taking Neurontin for pain. (June 17, 2024, Groff Administrative Note, ECF No. 29-1, PageID.161.) Shortly after Plaintiff's Pain Clinic visit, he sent in a medical request kite complaining of neck pain. (Kite Response, ECF No. 29-1, PageID.162.) The responding nurse scheduled an appointment with a nurse. (*Id.*) A clinical encounter note for the next day indicated that Plaintiff refused the appointment because he chose to wait until his chronic care visit with a medical provider. (ECF No. 29-1, PageID.163.) Plaintiff received his epidural steroid injection on August 1, 2024. (Pain Clinic Note, ECF No. 29-1, PageID.164–167.)

Plaintiff sent in a medical request kite on August 15, 2024. He explained that the injection provided pain relief but the pain returned even worse the next day. (Kite Response, ECF No. 29-1, PageID.170.) Plaintiff asked, "what was in the shot and the side ef[f]ect[s] and what [was] going to be done." (*Id.*) The kite response was handled by Defendant Villasan. (*Id.*) She forwarded the kite to Defendant Mikel to answer Plaintiff's question. (*Id.*)

Defendant Villasan provides a sworn affidavit that she left LCF on 6:37 a.m. on August 16, 2024, and that she did not work thereafter on August 16–18. (Villasan Aff., ECF No. 32-4, PageID.355–357.) Defendant Villasan reports that she did not speak or meet with Plaintiff during August of 2024. (*Id.*) Defendant Villasan states that she did not, and would not, tell Plaintiff that he would see Defendant Mikel because he is not a medical provider who could prescribe medication. (*Id.*) She also did not tell Plaintiff that he would see Defendant Groff or that he was

faking his pain. (*Id.*) She notes that she was not aware of any immediate or substantial risk to Plaintiff on August 16, 2024. (*Id.*)

Plaintiff offers no affirmative evidence in response to Defendant Villasan's affidavit.

Defendant Mikel provides a sworn affidavit that mirrors Defendant Villasan's. (Mikel Aff., ECF No. 33-1, PageID.391–393.) He received Plaintiff's kite and responded on August 20, 2024, identifying the shot that Plaintiff received and attaching a listing of the side effects. (*Id.*; Kite Response, ECF No. 29-1, PageID.171.) Defendant Mikel never had direct contact with Plaintiff. (Mikel Aff., ECF No. 33-1, PageID.391–393.) He never declined or refused to see Plaintiff. (*Id.*) He was unaware of any immediate or substantial risk to Plaintiff in August of 2024. (*Id.*)

Plaintiff offers no affirmative evidence in response to Defendant Mikel's affidavit.

On August 24, 2024, the health care department received a call from an officer on Plaintiff's unit explaining that Plaintiff was suffering from neck pain and could not handle it anymore. (Clinical Encounter Note, ECF No. 29-1, PageID.172.) A nurse reported to Plaintiff's unit and spoke with him. (*Id.*) Plaintiff asked to be sent to the emergency room; but the nurse, considering his symptoms, instructed Plaintiff to place a medical request kite for a nurse visit. (*Id.*) The nurse also noted that Plaintiff was to be seen soon at the pain clinic. (*Id.*) Plaintiff complied and a nurse visit was scheduled. (Kite Response, ECF No. 29-1, PageID.173.)

On August 27, 2024, a nurse saw Plaintiff at the health care clinic. (Clinical Encounter Note, ECF No. 29-1, PageID.174–176.) The nurse examined Plaintiff and acknowledged that Plaintiff suffered observable pain. (*Id.*) A chronic care appointment was scheduled. (*Id.*)

On August 30, 2024, Plaintiff saw Defendant Groff at the health care clinic. (Clinical Encounter Note, ECF No. 29-1, PageID.177–182.) The chronic care visit addressed many of Plaintiff's chronic conditions, including his neck pain. (*Id.*) Defendant Groff examined Plaintiff's

neck. (*Id.*) She identified the lump that Plaintiff had complained about. (*Id.*) She opined that it might be bone or metal hardware from Plaintiff's surgeries. (*Id.*) She ordered x-rays for further evaluation. (*Id.*)

Plaintiff was x-rayed on September 5, 2024. (Radiology Report, ECF No. 29-1, PageID.183.) The radiologists did not identify any compression fractures, but noted scattered degenerative disc disease and spurring. (*Id.*)

After reviewing the radiology report, Defendant Groff sought authorization for a neurosurgery examination. (Admin. Note, ECF No. 29-1, PageID.186.) Defendant Groff also sought authorization for a repeat MRI—the previous MRI had been performed on September 12, 2023. (Admin. Note, ECF No. 29-1, PageID.187.) Defendant Groff also authorized medication changes (Admin. Notes, ECF No. 29-1, PageID.188, 189.)

The MRI was conducted on October 25, 2024. (Imaging Result Report, ECF No. 29-1, PageID.191–192.) The report noted mild degenerative changes and cervical spondylosis. (*Id.*) In the months that followed, Plaintiff was seen each time he complained about pain. His medications were adjusted.

On March 17, 2025, Plaintiff was seen by Henry Ford Neurosurgery. Nurse Practitioner Joanne Huske advised Plaintiff that he "look[ed] well fused and there [was] no further surgery that would provide him any type of symptom relief." (Progress Notes, ECF No. 29-2, PageID.227.) In the months that followed, Plaintiff was seen each time he complained about pain. His medications were adjusted.

Defendant Groff has provided an affidavit recounting her involvement in Plaintiff's care. (Groff Aff., ECF No. 29-3, PageID.281–286.) It tracks the medical record. Defendant Groff notes that she was not aware of Plaintiff's mid-August 2024 kite until her visit with Plaintiff on August

30, 2024. (*Id.*) After that encounter, she ordered diagnostic imaging, referred Plaintiff for neurosurgical evaluation, adjusted medications, and continued to regularly monitor and address Plaintiff's chronic conditions. (*Id.*)

Plaintiff offers no affirmative evidence in response to Defendant Groff's affidavit.

Plaintiff claims that Defendants provided no medical treatment for his neck pain. To credit that position the Court would have to be wearing blinders. Plaintiff's general contention that Defendants provided no medical care for his neck pain is " blatantly contradicted by the only medical evidence that ha[s] been presented." *Booher*, 555 F. App'x at 484. No reasonable jury could believe Plaintiff when he says that he received no medical treatment for his neck pain. Accordingly, the Court will not consider Plaintiff's showing on the objective seriousness of his medical need from the perspective that he received no treatment.

**b. Delayed or Inadequate Treatment**

It is apparent that Plaintiff suffered a serious medical condition regarding his neck. He received treatment—including surgery, medications, prescribed exercise, and assistive devices—for years before August of 2024. But, "[t]he mere presence of a serious medical condition is insufficient to establish the objective component." *Hodges v. Abram*, 138 F.4th 980, 990 (6th Cir. 2025) (quoting *Brady v. Powers*, No. 1:10-cv-45, 2011 WL 673949, at *3 (W.D. Mich. Feb. 17, 2011)) (modification in original, internal quotation marks omitted). Plaintiff "must make an objective showing that the deprivation was sufficiently serious or that the result of the defendant's denial was sufficiently serious." *Brady*, 2011 WL 673949 at *3.

In *Rhinehart v. Scutt*, 894 F.3d 721 (6th Cir. 2018), the Sixth Circuit explained what Plaintiff must show:

> [W]hen an inmate has received on-going treatment for his condition and claims that this treatment was inadequate, the objective component of an Eighth Amendment claim requires a showing of care "so grossly incompetent, inadequate, or excessive

> as to shock the conscience or to be intolerable to fundamental fairness." *See Miller v. Calhoun Cty.*, 408 F.3d 803, 819 (6th Cir. 2005) (quoting *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989) ). The plaintiff must present enough evidence for a factfinder to evaluate the adequacy of the treatment provided and the severity of the harm caused by the allegedly inadequate treatment. There must be "medical proof that the provided treatment was not an adequate medical treatment of [the inmate's] condition or pain." *Santiago v. Ringle*, 734 F.3d 585, 591 (6th Cir. 2013). This will often require "expert medical testimony . . . showing the medical necessity for" the desired treatment and "the inadequacy of the treatments" the inmate received. *Anthony v. Swanson*, 701 F. App'x 460, 464 (6th Cir. 2017); *see Pearson v. Prison Health Serv.*, 850 F.3d 526, 535 (3d Cir. 2017) (explaining that adequacy-of-care claims may require expert testimony "to create a genuine dispute that the prisoner's medical needs are serious"). The plaintiff also must "place verifying medical evidence in the record to establish the detrimental effect" of the inadequate treatment. *Blackmore*, 390 F.3d at 898 (quoting *Napier v. Madison Cty., Ky.*, 238 F.3d 739, 742 (6th Cir. 2001) ); *cf. Broyles v. Corr. Med. Servs., Inc.*, 478 F. App'x 971, 975 (6th Cir. 2012) (holding that defendant had "met this requirement" at the motion-to-dismiss stage "by alleging statements by [doctors] linking the delay in treatment to the permanency of his vision impairment").

*Rhinehart*, 894 F.3d at 737–38. Plaintiff has failed to make the necessary showing.

Plaintiff claims the treatment he received was inadequate because Defendants did not authorize surgical intervention; but he has failed to provide medical proof that surgery was appropriate. The medical record shows that it was not. (Progress Notes, ECF No. 29-2, PageID.219–228.) As noted above, Henry Ford Neurosurgery Nurse Practitioner Joanne Huske advised Plaintiff that he "look[ed] well fused and there [was] no further surgery that would provide him any type of symptom relief." (*Id.* at 227.)

The only contrary indication is Plaintiff's "verified" statement that Dr. Ullah told Plaintiff that surgery was necessary. Even if one ignores the fact that the verification is insufficient, the subject matter of the statement as presented cannot be properly verified because it is inadmissible hearsay. Moreover, Plaintiff's recollection of the statement is suspect at best.

Dr. Ullah is the radiology resident who reviewed Plaintiff's October 25, 2024, MRI and prepared the report—a report that found "mild degenerative changes and cervical spondylosis." (Imaging Result, ECF No. 29-1, PageID.191–192.) Plaintiff testified at his deposition that he did

not have documentation of Dr. Ullah's statement, that the statement was made while Plaintiff was in Dr. Ullah's office at Henry Ford at some time after Dr. Ullah prepared the Imaging Result report. Plaintiff acknowledged that he was relying on his memory that Dr. Ullah told Plaintiff that the doctor did not want to do the surgery at that time because Plaintiff was in too much pain, but that Plaintiff would have to undergo surgery in the future. (Bellman Dep. Tr. Excerpts, ECF No. 29-4, PageID.287–289.) It seems unlikely that a radiology resident, after reviewing MRI images, would communicate surgery recommendations to a patient. But, if in fact that occurred, there is no indication that the recommendation was communicated to Defendants. Moreover, it proved to be prudent for Defendants to wait until the Henry Ford Neurosurgery department weighed in, particularly because the specialist reached a contrary conclusion.

The Court concludes that Defendants have shown that Plaintiff received treatment and they have shown that the treatment provided, based on the information available was appropriate. To counter Defendants' showing, Plaintiff must show with medical proof that the treatment was inadequate and that the failure to provide timely adequate treatment resulted in harm. Plaintiff has not made that showing. Accordingly, the Court concludes that there are no genuine issues of material fact with regard to the objective component of Plaintiff's Eighth Amendment deliberate indifference claim and Defendants are entitled to judgment as a matter of law on that claim.

**2. Subjective Component**

The subjective component requires that the defendant act with deliberate indifference to an inmate's health or safety. *See Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991). To establish the subjective component, the plaintiff must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Mere negligence in diagnosing or treating a medical condition

does not constitute an 8th Amendment violation. *Id*. at 835. "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

**a. Defendant Villasan**

Based on Defendant Villasan's affidavit and the medical record, Plaintiff has failed to show that Defendant Villasan was deliberately indifferent. According to Defendant Villasan, her only role in Plaintiff's care during the mid-August 2024 time frame was responding to Plaintiff's medical kite request that asked for the name of the drug injected at the pain clinic on August 1, 2024, and a list of the side effects. Defendant Villasan forwarded that request to Defendant Mikel and Mikel responded with that information. There is nothing about that sequence of events that demonstrates Defendant Villasan's knowledge of a significant risk of serious harm to Plaintiff or disregard of that risk.[9]

Ignoring Defendant Villasan's affidavit and only considering Plaintiff's verifiable allegations[10] and his deposition testimony does not change that result. Plaintiff testified that he not only sent the medical kite request on August 15, but that he also saw Defendant Villasan on her way out of the clinic on August 16. Plaintiff reports that Defendant Villasan told Plaintiff that he would be seeing Defendant Mikel. (Bellman Dep. Tr. Excerpts, ECF No. 32-2, PageID.342–344.) All parties agree that Plaintiff was never seen by Defendant Mikel.

[9] Moreover, Defendant Villasan's account is entirely consistent with the MDOC policy and Defendant Groff's affidavit regarding the delivery of health care services.

[10] As explained above, the Court concludes that Plaintiff's statements that are not made on personal knowledge or that constitute inadmissible hearsay—such as Plaintiff's statements that he heard that Defendants did not believe Plaintiff's allegations of neck pain—are not proper subjects of verification under Federal Rule of Civil Procedure 56(c)(4) as presented.

Plaintiff offers no evidence to support Plaintiff's implicit claim that Defendant Villasan was aware of a substantial risk of serious harm to Plaintiff or that she disregarded such a risk. Plaintiff's deposition testimony supports Defendant Villasan's claim that she was coming off shift early on the morning of August 16, 2024. Plaintiff does not dispute that Defendant Villasan passed Plaintiff's medical kite request on to Defendant Mikel, the Health Unit Manager. Even if Defendant Villasan's alleged representation that Plaintiff would meet with Defendant Mikel was just plain wrong, Plaintiff presents no evidence that Defendant Villasan knew, on August 16, that Defendant Mikel would not meet with Plaintiff or that their failure to meet would cause harm to Plaintiff.

**b. Defendant Mikel**

Similarly, Plaintiff offers no evidence to indicate that Defendant Mikel was aware of Defendant Villasan's assertion that Defendant Mikel would meet with Plaintiff. There is nothing in the medical record or in Plaintiff's verifiable allegations or in his deposition testimony to suggest that Defendant Mikel was aware of any responsibility toward Plaintiff beyond responding to his question regarding the injection and possible side effects. Plaintiff does not dispute that Defendant Mikel responded with the information Plaintiff requested within the time required by MDOC policy. Defendant Mikel has presented evidence that he was not aware of any substantial risk of harm to Plaintiff and that he did not disregard any such risk. Plaintiff submits no affirmative evidence to the contrary. Thus, Plaintiff has not shown that Defendant Mikel was deliberately indifferent either.

**c. Defendant Groff**

Finally, with regard to Defendant Groff, Plaintiff offers no evidence to indicate that Defendant Groff was aware of Plaintiff's August 15, 2024, medical request kite or any statement to Plaintiff that Defendant Groff would meet with Plaintiff to address the questions raised in that

kite. It is not the case that Plaintiff had no other contact with healthcare personnel at LCF after he received the response to his medical request kite. Consistent with MDOC policy, on August 24, 2024, an officer on Plaintiff's unit contacted healthcare to request medical assistance to address Plaintiff's complaints of neck pain. (Admin. Note, ECF No. 29-1, PageID.172.) A nurse visited Plaintiff on the unit. (*Id.*) The nurse assessed Plaintiff's symptoms and advised him to submit a kite for a nurse visit. (*Id.*) Plaintiff submitted a kite that day. (Kite Response, ECF No. 29-1, PageID.173.) Plaintiff was seen by Registered Nurse Cody Baker in the healthcare clinic on August 27, 2024. (Clinical Encounter Note, ECF No. 29-1, PageID.174–176.) Nurse Baker recognized that Plaintiff was in pain and contacted a scheduler to set up Plaintiff's next chronic care appointment. (*Id.*)

Plaintiff saw Defendant Groff in the healthcare clinic for the scheduled chronic care visit on August 30, 2024. (Clinical Encounter Note, ECF No. 29-1, PageID.177–182.) During that visit, Defendant Groff assessed the lump on Plaintiff's neck. (*Id.*) Defendant Groff could not discern whether the lump was bone or metal hardware from Plaintiff's prior surgeries, but she noted it was tender to palpation. (*Id.*) She ordered x-rays to facilitate an accurate diagnosis. (*Id.*) The x-rays, the MRI, two encounters with Dr. Crompton, medication changes, and Plaintiff's visit with Henry Ford Neurosurgery followed.

Plaintiff offers no evidence that indicates Defendant Groff was aware of Plaintiff's August 15, 2024, medical kite request—or any other healthcare request thereafter—until Plaintiff's scheduled chronic care assessment on August 30, 2024. There is nothing in Plaintiff's verifiable allegations, the medical record, the submitted affidavits, or Plaintiff's deposition transcript excerpts that shows that Defendant Groff was aware that Plaintiff was subject to a substantial risk

of serious harm or that she disregarded any such risk. Thus, Defendant Groff is entitled to summary judgment on the subjective component of Plaintiff's Eighth Amendment claim as well.

**C. State Law Violations as a Ground for Relief Under § 1983**

Claims under § 1983 can only be brought for "deprivations of rights secured by the Constitution and laws of the United States." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 924 (1982). Section 1983 does not provide redress for a violation of state law. *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995); *Sweeton v. Brown*, 27 F.3d 1162, 1166 (6th Cir. 1994). Plaintiff's assertions that Defendants violated MDOC policies or that their conduct rose to the level of gross negligence under state law does not give rise to a claim under § 1983, if any such claim was intended.

**IV. State Law Claims**

Plaintiff seeks to invoke this Court's supplemental jurisdiction over state-law claims that Defendants actions (or inactions) violated MDOC policy and gave rise to an actionable tort claim for gross negligence. The Court declines to exercise such jurisdiction.

Ordinarily, where a district court has exercised jurisdiction over a state-law claim solely by virtue of supplemental jurisdiction and the federal claims are dismissed prior to trial, the court will dismiss the remaining state-law claims. *See Experimental Holdings, Inc. v. Farris* 503 F.3d 514, 521 (6th Cir. 2007) ("Generally, once a federal court has dismissed a plaintiff's federal law claim, it should not reach state law claims.") (citing *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966)); *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993). In determining whether to retain supplemental jurisdiction, "[a] district court should consider the interests of judicial economy and the avoidance of multiplicity of litigation and balance those interests against needlessly deciding state law issues." *Landefeld*, 994 F.2d at 1182; *see also Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006) ("Residual jurisdiction should be

exercised only in cases where the interests of judicial economy and the avoidance of multiplicity of litigation outweigh our concern over needlessly deciding state law issues." (internal quotations omitted). Dismissal, however, remains "purely discretionary." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) (citing 28 U.S.C. § 1367(c)); *Orton v. Johnny's Lunch Franchise, LLC*, 668 F.3d 843, 850 (6th Cir. 2012).

Here, the balance of the relevant considerations weighs against the continued exercise of supplemental jurisdiction. Accordingly, Plaintiff's state-law claims will be dismissed without prejudice.

**Conclusion**

Based upon the evidence submitted by the parties, Defendants have shown that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law. Accordingly, the Court will grant Defendants' motions for summary judgment.[11] Moreover, the Court will dismiss Plaintiff's state-law claims because it declines to exercise supplemental jurisdiction over those claims.

The Court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3). *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997). For the same reasons the Court concludes that Plaintiff's claims are without merit, the Court also concludes that any issue Plaintiff might raise on appeal would be frivolous. *Coppedge v.*

---

[11] In light of the Court's decision on Defendants' motions for summary judgment, the Court will deny as moot Defendant Groff's motion to dismiss the complaint for failure to state a claim. (ECF No. 17.)

*United States*, 369 U.S. 438, 445 (1962). Accordingly, the Court certifies that an appeal would not be taken in good faith.

An order and judgment consistent with this opinion will be entered.

Dated: September 18, 2026

/s/ Hala Y. Jarbou
HALA Y. JARBOU
CHIEF UNITED STATES DISTRICT JUDGE